**Donald Ray SANFORD, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 08–98–00094–CR.**

Court of Appeals of Texas,
El Paso.

Jan. 6, 2000.

## OPINION

ANN CRAWFORD McCLURE, Justice.

Donald Ray Sanford appeals from convictions for the offenses of aggravated kidnapping and the lesser-included offense of aggravated assault with a deadly weapon.[1] A jury found Appellant guilty, and with respect to each offense, assessed punishment at imprisonment for a term of ten years, probated for ten years, and a fine of $10,000. The trial court entered in each judgment an affirmative finding on the use of a deadly weapon. TEX.CODE CRIM.PROC. ANN. art. 42.12, § 3g(a)(2)(Vernon Supp. 1999). We reverse.

## FACTUAL SUMMARY

Mike Herrington, the complainant, met Appellant in 1991 or 1992 when he purchased a sailboat from Appellant at a boat show. Herrington worked in law enforcement in Ector County for several years; he additionally sold Shaklee products and worked for Appellant on a contract basis in the sailboat business. Some of his tasks included installing radios and hauling sailboats from Florida to Odessa. Appellant and Herrington spent a significant amount of time together and they became friends. After being terminated from his position as investigator with the County Attorney's Office in late 1993, Herrington began working more often with Appellant but still on a part-time basis. In January of 1996, Herrington abruptly severed his relationship with Appellant over a business deal with one of Herrington's friends. He did not have any contact with Appellant until June of that year when Appellant had lunch with Herrington and accused him of burglarizing his home and stealing $100,000 from a safe. Herrington testified that he and Appellant "left on very heated terms" and he had no further contact with Appellant until November. Although the Sheriff's Department conducted an investi-

Colin B. Amann, Houston, for appellant.

John W. Smith, Dist. Atty., J. Roderick Price, Deputy Dist. Atty., Odessa, for State.

Before Panel No. 2 BARAJAS, C.J., McCLURE, and CHEW, JJ.

---

1. By a single, two-count indictment, Appellant was originally charged with aggravated kidnapping and attempted murder.

gation, no charges were ever filed against Herrington.

On November 13, 1996, Herrington's wife, Sandra, received a telephone call from a woman who identified herself as Sharon Day. She said that a friend told her that the Herringtons sold Shaklee weight loss products. Sandra asked if Day would like to come to their home to look at the products and discuss them but Day stated that she was in the process of moving back to Odessa. She asked if someone could meet her the following morning at a house located at 61st and Beatty since she would be moving some things into it. Ms. Herrington agreed and they set up an appointment for Herrington to meet with Day at 8:30 on the following morning. Ms. Herrington told Day that her husband would be driving a white Suburban. When Herrington came home that evening, Ms. Herrington told him about the appointment.

The following morning, Herrington gathered his Shaklee materials and drove his Suburban to the address, arriving at approximately 8:30. He saw a house that appeared vacant and had a "For Sale" sign in the window. At first he drove by since he did not see anyone at the house, but he turned around when he saw a small red car pull into the driveway. Herrington pulled in behind the vehicle, gathered some of the Shaklee materials and exchanged introductions with Day who had approached the front of his vehicle by that time. When he asked if they could go inside, Day said that she did not have a key yet and suggested that they just use the hood of the car. After Herrington turned around and placed the papers on the hood, he sensed someone behind him. He turned and saw Appellant walking towards him. When he asked what Appellant was doing there, he replied, "I am here to arrest you." Herrington saw that Appellant was wearing a black nylon shoulder holster which held a pistol and two clips. As Herrington turned to leave and get into his car, Appellant blocked his path so Herrington shoved him in the chest. Appellant stepped backwards about three steps, pulled the gun out of the holster, and shot Herrington in the leg. Believing Appellant was going to shoot him again, Herrington dove towards Appellant to get the gun away from him. Herrington landed on top of Appellant, who repeatedly bit Herrington's ear and arm. When Herrington heard Appellant repeatedly yelling for Day to get the gun, he became afraid that Day would shoot him so he stopped fighting. Appellant rolled over on top of Herrington and used some plastic ties to handcuff Herrington's hands behind his back. Appellant and Day then picked up Herrington, and threw him against the passenger side of the Suburban before putting him on the floor of the vehicle. Herrington heard Appellant tell Day to put ties on his legs but he could not see who actually restrained him. Appellant then went to the front of the Suburban and gathered the Shaklee materials that had been scattered during the scuffle. Appellant found the keys in Herrington's pocket and they drove away.

In the meantime, Herrington, who was laying on his back, had been able to remove a Leatherman knife from a scabbard on his belt and cut the plastic tie that bound his hands. He could not immediately cut his legs free because they were placed across the front seat in the view of Appellant. Herrington also knew they were traveling too fast to be able to leap from the vehicle so he waited until they approached a light, hoping that they would have to stop. When Appellant slowed the vehicle to turn, Herrington quickly cut his legs free and dove into the front seat in an effort to throw the vehicle into park. Appellant reached down into a bag on the floorboard and pulled out the same pistol. Herrington dropped his knife and grabbed the pistol. As the two men struggled, the gun discharged into the bag on the floorboard. Herrington was eventually able to get the weapon and he demanded that Appellant drive him to a hospital. Appel-

lant complied and took Herrington to an Odessa hospital. As he got out of the vehicle, Herrington told Appellant, "You might as well go home, because they are going to come get you." Appellant drove away in the Suburban and, according to hospital records, Herrington walked into the emergency room at 9:08 a.m. He told them that he had been shot and he had a pistol in the waistband of his pants. Hospital security seized the weapon and emergency room personnel treated Herrington for the gunshot wound.

Dr. Michael Simmons, the treating physician, examined Herrington and found that a bullet entered Herrington's leg above the knee and exited behind the leg, narrowly missing the femoral artery. He also found human bite marks on Herrington's ear, left trapezius, and the rear of his left shoulder. Law enforcement officers recovered Herrington's Suburban approximately one and a half hours later after receiving information from an attorney who represented Appellant.

## VIOLATION OF ATTORNEY– CLIENT PRIVILEGE

In the first issue presented on appeal, Appellant maintains that the admission of testimony that a law enforcement officer, after speaking with Appellant's attorney, went immediately to a certain location and recovered the complainant's vehicle violated the attorney-client privilege.[2] Relying on *Fuller v. State*, 835 S.W.2d 768 (Tex. App.—Eastland 1992, pet. ref'd), the State argued in the trial court that Appellant waived the privilege when his attorney revealed the information about the vehicle's location to law enforcement authorities. The State makes the additional argument

on appeal that the privilege does not apply because counsel would have become a party to the offense had he not disclosed this information. We disagree with both of the State's arguments.

Joel Perkins, an investigator with the Ector County Sheriff's Department, testified that on the morning of November 14, 1996, he was assigned to go to the law office of Michael McLeaish in Odessa. The reason for this assignment was not made known in the trial court. He arrived at the office at 10:21 a.m. and saw Appellant and his wife sitting in McLeaish's office. He also saw a van marked "Sanford Sails" parked outside of the office. Perkins met with McLeaish and then went directly to the Ector County Coliseum where he found Herrington's Suburban. They towed the vehicle to the Sheriff's Department so that they could gather evidence.

During the course of a hearing on the admissibility of this evidence, the State did not call McLeaish to testify about these events. However, the prosecutor represented to the trial court, without objection, that Perkins asked McLeaish, "Do you know where Mr. Herrington's vehicle is?"[3] McLeaish replied, "Just a minute" and went back inside of his office. He came back out and told Perkins, "It might be at the coliseum and it might have the keys in it." Additionally, Appellant testified outside of the jury's presence that he went to McLeaish's office for the purpose of seeking legal counsel. He hired McLeaish to represent him during the course of this meeting and paid him by check. At one point during the meeting, Appellant saw through a large glass wall in McLeaish's office that Perkins had walked into

---

2. Appellant further contends that this same testimony is inadmissible hearsay but we need not reach this issue since we find that it is inadmissible because it violated the attorney-client privilege.

3. Under certain circumstances, this Court accepts as true factual assertions made by counsel which are not disputed by opposing coun-

sel. *Pitts v. State*, 916 S.W.2d 507, 510 (Tex. Crim.App.1996); *Emerson v. State*, 820 S.W.2d 802 (Tex.Crim.App.1991); *Canada v. State*, 660 S.W.2d 528 (Tex.Crim.App.1983); *Hicks v. State*, 525 S.W.2d 177 (Tex.Crim.App. 1975). Because Appellant did not object to the prosecutor's statements or otherwise dispute them, we will accept them as true.

the office. Appellant knew Perkins because he had investigated the burglary at Appellant's home. When McLeaish saw Perkins, he immediately walked outside. Appellant assumed that they were having a conversation but he could not see them. In a few moments, McLeaish came back into the room and asked Appellant, "Where is the Suburban?" Appellant stated, "At the coliseum." Without further comment, McLeaish left the room again. Appellant did not ask McLeaish why he wanted that information or what he intended to do with it. Further, McLeaish did not ask Appellant whether he wished to waive his attorney-client privilege. The trial court admitted Perkins' testimony over Appellant's objections that it was backdoor hearsay and that it violated the attorney-client privilege.

Under Rule 104(a), preliminary questions concerning the admissibility of evidence and the existence of a privilege shall be determined by the trial court. TEX. R.EVID. 104(a); *McVickers v. State,* 874 S.W.2d 662, 664 (Tex.Crim.App.1993); *Welch v. State,* 908 S.W.2d 258, 264 (Tex. App.—El Paso 1995, no pet.). The trial court is afforded broad discretion in the determination of such questions, and its ruling will not be reversed absent an abuse of discretion. *McVickers,* 874 S.W.2d at 664; *Welch,* 908 S.W.2d at 264.

■ By virtue of the attorney-client privilege, a client has a privilege to refuse to disclose, and to prevent any other person from disclosing, confidential communications made for the purpose of facilitating the rendition of professional legal services. TEX.R.CRIM.EVID. 503(b);[4] *Austin v. State,* 934 S.W.2d 672, 674 (Tex.Crim.App.1996). A communication is "confidential" if not intended to be disclosed to third persons other than those to whom the disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary to the transmission of the communication. TEX. R.CRIM.EVID. 503(a)(5). Further, in criminal cases, a client has a privilege to prevent the lawyer or the lawyer's representative from disclosing any other fact which came to the knowledge of the lawyer or the lawyer's representative by reason of the attorney-client relationship. TEX. R.CRIM.EVID. 503(b). Underlying this privilege is an attorney's need to "know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out." *Strong v. State,* 773 S.W.2d 543, 547 (Tex.Crim.App. 1989), *quoting Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 1577, 48 L.Ed.2d 39 (1976). Thus, the aspirational purpose of the privilege is the promotion of communication between attorney and client unrestrained by fear that these confidences may later be revealed. *Strong,* 773 S.W.2d at 547. Despite its salutary aim, the privilege has not been without criticism. As noted in *Strong,* critics of the privilege maintain that it impedes the full and free discovery of the truth. *Id.* At least to some extent, the exceptions to the privilege found in Rule 503(d) reflect the balance struck between the interests promoted by the privilege and the truth-seeking interests of the administration of justice. *See* TEX.R.CRIM.EVID. 503(d).

■ The power to waive the attorney-client privilege belongs to the client, or his attorney or agent both acting with the client's authority. *Carmona v. State,* 941 S.W.2d 949, 953 (Tex.Crim.App.1997); TEX. R.CRIM.EVID. 503(c). The client bears the burden of establishing the existence of the privilege. *Austin,* 934 S.W.2d at 674. However, the party seeking to benefit by a finding of waiver of the privilege has the burden of going forward with evidence that supports a finding of waiver. *Carmona,* 941 S.W.2d at 953. We examine the

---

**4.** This case was tried in February of 1998, prior to the March 1, 1998 effective date of the Texas Rules of Evidence. Both rules refer to the privilege as the lawyer-client privilege but we will use the more common phrase attorney-client privilege throughout this opinion.

totality of the circumstances and reasonable inferences therefrom in determining whether the privilege has been waived. *Carmona*, 941 S.W.2d at 954.

■ The State does not dispute that Appellant established the existence of the privilege. Therefore, we will first address the State's trial argument that Appellant waived the attorney-client privilege when his attorney disclosed the location of the vehicle. In *Fuller*, the case relied on by the State in the trial court, two murder defendants met with an attorney and discussed their participation in the shooting. Out of the presence of his clients, the attorney subsequently told members of the sheriff's department that the shooting was in self-defense. Later the same day, the two defendants and their attorney went to the sheriff's department to turn in the weapons used in the shooting. Again outside of his clients' immediate presence but within hearing of the defendants, the attorney made references to the shooting based on the clients' statements to him. When the State attempted to introduce these statements at trial, the defendants objected on the basis of the attorney-client privilege. During a hearing on the issue, the attorney admitted that he had not been expressly authorized to reveal the information but that he did so because he believed it was his duty as an advocate to convince the sheriff's department what in actuality happened. The trial court admitted certain statements of the attorney after finding that the defendants waived their privilege by voluntarily consenting to disclosure of the information. The Eastland Court of Appeals held that the party asserting the privilege has the burden of disproving the waiver or establishing the limited scope of the waiver. *Fuller*, 835 S.W.2d at 769, *citing Jordan v. Court of Appeals for the Fourth Supreme Judicial District*, 701 S.W.2d 644 (Tex.1985), *and State ex rel. Simmons v. Peca*, 799 S.W.2d 426 (Tex.

App.—El Paso 1990, no pet). The Court found that the defendants had not met their burden of disproving a waiver of the attorney-client privilege. *Fuller*, 835 S.W.2d at 771.

■ The State's reliance on *Fuller* is misplaced because the Court of Criminal Appeals disavowed that decision in *Carmona*. It is now clear, at least in criminal cases, that the burden of proving waiver is on the State. *Carmona*, 941 S.W.2d at 954 (noting that civil and criminal cases are not consistent on which party has the burden of going forward with evidence on the waiver issue). Furthermore, the mere fact that privileged materials have been disclosed does not establish a presumptive or automatic waiver. *Carmona*, 941 S.W.2d at 954. Thus, McLeaish's disclosure of the vehicle's location to Perkins, standing alone, is insufficient to support a finding of waiver. *See Carmona*, 941 S.W.2d at 954 (disapproving intermediate court's holding that disclosure of privileged materials by a defendant's lawyer is sufficient to support a finding of waiver). The additional evidence that Appellant answered his attorney's question while knowing that McLeaish had presumably been speaking with a law enforcement officer does not support a finding of waiver because there is no evidence that Appellant knew when he answered the question that his attorney intended to reveal this information to Perkins. To the contrary, Appellant explained that he believed McLeaish was representing him in asking for the information and he did not know what he was going to do with the information. Under these facts, we conclude that the State failed to prove that Appellant waived the attorney-client privilege.

The State also argues that McLeaish could have become a party to the offense if he had not disclosed this information to the sheriff's department.[5] The State mis-

---

5. The State does not rely on the crime-fraud exception to Rule 503 which provides that there is no privilege under Rule 503 if the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or rea-

apprehends Appellant's contention. Appellant does not complain that the attorney-client privilege was violated when his attorney revealed this information to Deputy Perkins so that the physical evidence should have been excluded by virtue of Rule 503. Instead, Appellant asserts that the attorney-client privilege prohibited the State from revealing that information provided by his attorney led police to the evidence. Thus, the State's argument that counsel had an ethical obligation to reveal the information to law enforcement authorities is beside the point.[6]

Whether the State may introduce into evidence the fact that counsel is the source of the evidence is an issue of first impression in Texas. However, several other jurisdictions hold that the State may not, when introducing the evidence received from counsel, reveal the source of the evidence in the presence of the jury because it would violate the attorney-client privilege. *See Hitch v. Pima County Superior Court*, 146 Ariz. 588, 595, 708 P.2d 72, 79 (Ariz.1985)(attorney required to turn over inculpatory physical evidence to prosecution but prosecution could not mention in front of jury that evidence came from defendant or his attorney); *People v. Nash*, 418 Mich. 196, 341 N.W.2d 439 (Mich.1983)(attorney has a duty to turn over to the police physical evidence of a crime received during the representation of a client but introduction of evidence that items had been obtained from defense attorney's office violated the attorney-client privilege); *Anderson v. State*, 297 So.2d 871 (D.C.App.Fla.1974)(attorney who represented accused in receiving and conceal-

ing stolen property turned over to the police the allegedly stolen items; thereafter, the state of Florida sought to force attorney or his receptionist to testify regarding source of items; attorney-client privilege barred counsel or his receptionist from divulging source of allegedly stolen items and state prohibited from introducing evidence that they received the evidence from attorney); *State ex rel. Sowers v. Olwell*, 64 Wash.2d 828, 834, 394 P.2d 681, 685 (Wash.1964)(if attorney turns over evidence to police, the attorney-client privilege would prohibit the state from showing at trial that evidence was received from attorney). By allowing the State to recover the evidence, the public interest is served, and by refusing the State an opportunity to disclose the source of the evidence, the attorney-client privilege is preserved. *Olwell*, 394 P.2d at 685. We are persuaded that this balancing of interests is the correct approach. Consequently, we find that the trial court abused its discretion in admitting evidence that law enforcement officers recovered the complainant's vehicle after speaking to Appellant's attorney.

## WAS THE ERROR HARMFUL?

Having found error, we must conduct a harm analysis. The standards for determining whether an error is harmful are found in Tex.R.App.P. 44.2. Rule 44.2(a), which applies only to constitutional errors, provides that: "[T]he court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the

---

sonably should have known to be a crime or fraud. Tex.R.Crim.Evid. 503(d)(1).

**6.** The Texas Disciplinary Rules of Professional Conduct prohibit a lawyer from revealing confidential information except under certain circumstances. *See* Tex. Disciplinary R. Prof'l Conduct 1.05, reprinted in Tex.Gov't Code Ann. tit. 2, subtit. G, app. A-1 (1998)(Tex. State Bar R. art. X, § 9). One exception is found in Rule 4.01(b) which provides that in the course of representing a client, a lawyer shall not knowingly fail to disclose a material fact

to a third person when disclosure is necessary to avoid making the lawyer a party to a criminal act or knowingly assisting a fraudulent act perpetrated by a client. *See* Tex. Disciplinary R. Prof'l Conduct 4.01(b), reprinted in Tex. Gov't Code Ann. tit. 2, subtit. G, app. A-1 (1998)(Tex State Bar R. art. X, § 9). Since the issue is not properly before us, we decline to pass upon the question whether McLeaish had an ethical obligation to reveal this information to law enforcement.

error did not contribute to the conviction or punishment." Tex.R.App.P. 44.2(a). For all other errors, we must apply subsection (b) which provides: "Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Tex.R.App.P. 44.2(b). Because Rule 44.2(a) requires reversal unless harmlessness is shown, it effectively places the burden on the State to show that the error is harmless. *Villalobos v. State*, 999 S.W.2d 132, 136 (Tex.App.—El Paso 1999, no pet.); *Merritt v. State*, 982 S.W.2d 634, 636 (Tex.App.—Houston [1st Dist.] 1998, pet. ref'd, untimely filed). Rule 44.2(b) is different because it requires us to disregard the error and affirm unless harm is affirmatively shown in the record. *Merritt*, 982 S.W.2d at 636. The effect of this is to place the burden on the defendant to show actual harm. *Villalobos*, 999 S.W.2d at 136. The first matter we must resolve, then, is whether this is constitutional error or "other" error.

■ Appellant asserts that we must apply Rule 44.2(a) because the attorney-client privilege is essential to both the Fifth Amendment privilege against self-incrimination and the Sixth Amendment right to counsel. The question, however, is not whether this error touches upon a constitutional right. *Merritt*, 982 S.W.2d at 636. Instead, the issue before us is whether the error violates a constitutional provision. *Id.* While the attorney-client privilege may bear some relationship to several constitutional rights, the privilege itself is not a principle of constitutional proportions. *Strong*, 773 S.W.2d at 547. Rather, it is a court-promulgated exclusionary rule of evidence. *Henderson v. State*, 962 S.W.2d 544, 553 (Tex.Crim.App. 1997); *Strong*, 773 S.W.2d at 547. Accordingly, we must apply Rule 44.2(b). *Accord United States v. Moody*, 923 F.2d 341, 352 (5th Cir.1991)(applying Fed.R.Crim.Proc.

52(a) to asserted violation of attorney-client privilege).[7]

■ Rule 44.2(b) requires us to examine error in relation to the entire proceeding and determine whether it had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim.App.1997), *citing Kotteakos v. U.S.*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)(discussing federal "harmless error" rule containing similar language). *See also O'Neal v. McAninch*, 513 U.S. 432, 437, 115 S.Ct. 992, 995, 130 L.Ed.2d 947 (1995); *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986). If the reviewing court determines that the error did not influence the jury, or "had but very slight effect," the verdict must stand. *Kotteakos*, 328 U.S. at 764–65, 66 S.Ct. at 1248; *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim.App.1998). Stated another way, the error must have affected the outcome of the lower court proceedings. *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 1778, 123 L.Ed.2d 508 (1993); *Fowler v. State*, 958 S.W.2d 853, 865 (Tex. App.—Waco 1997), *aff'd*, 991 S.W.2d 258 (Tex.Crim.App.1999)(holding that court of appeals' application of Rule 44.2(b) did not cause defendant to suffer an injustice so that old harmless error rule should have been applied). If the record fails to show that the error had such an impact, it cannot be said to affect a substantial right, and therefore, we are mandated to disregard the error. *Richardson v. State*, 981 S.W.2d 453, 457 (Tex.App.—El Paso 1998, pet. ref'd). If we have "grave doubts" about whether an error did not affect the outcome, we must treat the error as if it did. *Fowler*, 958 S.W.2d at 865, *citing United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986).

---

7. Because Rule 44.2(b) is taken directly from Federal Rule of Criminal Procedure 52(a) without substantive change, it is appropriate to rely on federal caselaw for guidance. *See* Tex.R.App.P. 44, notes and cmts.

 Recently, this Court and others have applied the *Harris*[8] factors in conducting the harm analysis mandated by Rule 44.2(b). *See e.g., Martinez v. State,* 993 S.W.2d 751, 759 (Tex.App.—El Paso 1999, pet. granted); *Paustian v. State,* 992 S.W.2d 625, 628 (Tex.App.—El Paso 1999, pet. ref'd); *Wheeler v. State,* 988 S.W.2d 363, 370 (Tex.App.—Beaumont 1999, pet. granted); *Brown v. State,* 978 S.W.2d 708, 715 (Tex.App.—Amarillo 1998, pet. ref'd); *Garza v. State,* 963 S.W.2d 926, 930 (Tex. App.—San Antonio 1998, no pet.). Upon closer examination, we believe this approach is incorrect for several reasons. In *Harris,* the Court of Criminal Appeals developed a construct for analyzing harm under former Rule 81(b)(2) whereby several factors are considered by the reviewing court. *See Harris,* 790 S.W.2d at 587–88 (court should examine source of the error, nature of the error, whether or to what extent it is emphasized by the State, probable collateral implications of the error, and whether declaring the error harmless would encourage the State to repeat it with impunity). As we have already noted, former Rule 81(b)(2) and now Rule 44.2(a) effectively place the burden on the beneficiary of the error, the State, to affirmatively demonstrate the absence of harm from a particular error or face reversal of the conviction. For the most part, the factors enunciated in *Harris* are consistent with the State's burden to shown harmlessness under Rule 44.2(a). When considering harm under Rule 44.2(b), however, the burden is on the defendant to show actual harm resulted from the error. Consideration of the *Harris* factors is inappropriate in this context because it effectively shifts the burden of showing harm from the defendant to the State. Furthermore, the factors are irrelevant to the inquiry under Rule 44.2(b) because they address the integrity of the process rather than whether the error had an actual prejudicial impact on the verdict. *See Harris,* 790 S.W.2d at 587. Finally, *Harris* plainly states that the reviewing court may not find an error

harmless due to the existence of overwhelming evidence of guilt. *Harris,* 790 S.W.2d at 587. This holding directly contradicts case authority construing the federal harmless error rule as well as Texas cases addressing Rule 44.2(b). *See e.g., United States v. Lane,* 474 U.S. at 450, 106 S.Ct. at 732 (misjoinder error held to be harmless in light of overwhelming evidence of guilt); *King v. State,* 953 S.W.2d 266, 273 (Tex.Crim.App.1997) (in light of the overwhelming evidence of future dangerousness that was properly admitted, any error in admitting certain other evidence did not have a substantial or injurious influence on the jury's decision); *Matthews v. State,* 979 S.W.2d 720, 723 (Tex. App.—Eastland 1998, no pet.) (admission of evidence of extraneous offense of assault was harmless in child abuse case, and did not effect defendant's substantial rights, in light of overwhelming evidence of his guilt); *Haney v. State,* 977 S.W.2d 638, 647 (Tex.App.—Fort Worth 1998, pet. ref'd) (erroneous admission of evidence of uncharged acts of sexual abuse of child victim by defendant did not require reversal of convictions for sexual abuse and indecency with a child, in light of overwhelming evidence of defendant's guilt), *overruled on other grounds by Howland v. State,* 990 S.W.2d 274 (Tex.Crim.App.1999); *Hinds v. State,* 970 S.W.2d 33, 36 (Tex.App.—Dallas 1998, no pet.) (any error arising out of police officer's testimony that not all allegations of sexual abuse are ultimately referred to district attorney's office for prosecution was harmless, where there was overwhelming evidence of defendant's guilt without officer's testimony); *Holmes v. State,* 962 S.W.2d 663, 675 (Tex.App.—Waco 1998, pet. ref'd, untimely filed) (improper jury argument harmless where State did not repeat the argument, and it offered overwhelming evidence establishing guilt). For all of these reasons, we decline to apply *Harris* to a Rule 44.2(b) harm analysis.

8. *Harris v. State,* 790 S.W.2d 568, 584–88 (Tex.Crim.App.1989).

Excluding the erroneously admitted evidence from consideration, our review of the record reveals that the evidence against Appellant is not overwhelming. The State had little physical evidence to directly link Appellant to these crimes. John Shoemaker, a pawnshop manager, testified that he had seen Appellant in possession of a Walther .380 firearm identical to the one used to shoot Herrington. According to Shoemaker, he had seen Appellant with the gun and a black nylon shoulder holster approximately two years earlier. Shoemaker's description of the shoulder holster matched that given by Herrington. The sheriff's department recovered a black velcro strap from Herrington's vehicle which Shoemaker believed to be "consistent" with a piece of Appellant's shoulder holster. Joe Don Latham, an Ector County Deputy Sheriff, observed some tire tracks at the scene which "seem[ed] to match" some tracks seen at Appellant's residence, but he admitted that he is not an expert in the field of tire track comparison. Finally, the sheriff's department found in the floorboard of the Suburban a phony federal arrest warrant for Herrington for the offense of "grand theft." While the physical evidence corroborated Herrington's version of the events to some extent, the defense vigorously challenged his credibility during cross-examination and by offering opinion testimony regarding his lack of truthfulness. Any doubts the jury may have had about Appellant's involvement in the crimes and Herrington's credibility necessarily disappeared in the face of the evidence that Appellant was seen seeking legal counsel less than two hours after the shooting and defense counsel revealed the location of the complainant's vehicle. Indeed, the State seized upon this evidence during final argument to directly link Appellant to the crime:

> If Mr. Sanford was not there, how did they find the Suburban at the coliseum? Joel Perkins, the detective, went to an office where he saw Mr. Sanford and his wife sitting inside the office of Mr. McLeaish, spoke to Mr. McLeaish, then he went to the coliseum and found the Suburban. How did it get there? Who would have driven it out there and left it? Do you think Mike Herrington would drive his own Suburban out to the coliseum and leave it while he's in the hospital, being treated for a gunshot wound? That didn't happen.

Based upon the record before us, we conclude that the erroneously admitted evidence had a substantial and injurious impact on the jury's verdict. TEX.R.APP.P. 44.2(b). Point of Error No. One is sustained. The judgment of conviction is reversed and remanded for a new trial.